MARY ANGELA MYRE, a Minor, by William Myre, her Father and Next Friend, Plaintiff-Appellee and Cross-Appellant, *v.* THE BOARD OF EDUCATION OF SENECA TOWNSHIP HIGH SCHOOL DISTRICT NO. 160, La Salle and Grundy Counties, Defendant-Appellant and Cross-Appellee.

Third District   No. 81—405

Opinion filed August 9, 1982.

ALLOY, J., dissenting.

Gerard E. Dempsey, of Klein, Thorpe and Jenkins, Ltd., of Chicago, and Ben A. Goodin, of Aurora, for appellant.

John F. Vickers, of Brusatte & Vickers, of Ottawa, for appellee.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

The substantive issue in this case is whether the trial court erred in granting injunctive relief to a former high school student for the school board's violation of her right to substantive due process of law. For the reason explained below, we do not decide that issue.

Mary Angela Myre, the plaintiff, filed a complaint in the circuit court of La Salle County on November 10, 1980, alleging that her rights to substantive due process had been violated when she was improperly subjected to in-school suspension and, as a consequence, missed certain examinations which could adversely affect her opportunity for college admission. The discipline measure resulted from Mary's having been found in possession of beer at an out-of-town football game on October 31, 1980. Mary, a high school senior at the time, admitted the offense and was given a choice as to which form her discipline would take—in-school or out-of-school suspension. After discus-

sing the matter with her parents, Mary chose in-school suspension for a five-day period, as specified in the student handbook for alcohol/drug use, and a two-month restriction on attending extra-curricular activities. Following a special meeting of the Seneca Township Board of Education (defendant herein) and Mary's father, the board approved the disciplinary measures. Mary began to serve her five-day in-school suspension on November 6, 1980.

By November 10, Mary had missed a biology II test, and stood to miss examinations in family living and accounting before the completion of the in-school suspension period. However, on that date she sought and obtained temporary injuctive relief from the circuit court. In addition to enjoining the school from preventing her from taking exams for the remainder of the in-school suspension period, the court ordered that Mary be permitted to make up all missed examinations.

The examinations were, in fact, taken by Mary. On December 22, 1980, the suit for permanent injunctive relief (count I of plaintiff's complaint) proceeded to a trial on the merits. Although she had received grades for the accounting and family living tests, her biology exam remained ungraded pending the court's ruling. At the conclusion of testimony on January 5, 1981, the court found that the rule under which Mary had been disciplined was a valid one but that, as applied to the circumstances herein, it constituted a deprivation of her rights to substantive due process. On January 16, 1981, the court entered its order granting permanent injunctive relief and ordering the school to credit grades for all examinations given pursuant to the T.R.O. The court further ordered that count III of plaintiff's complaint, in which she requested attorney fees pursuant to "§1983 of Title 42 of the United States Code, as amended," would be heard at a later date.

On February 26, 1981, plaintiff's complaint was amended to add that count I was brought pursuant to "§§1983 and 1988 of Title 42 of the United States Code," and that count III was being brought pursuant to section 1988. The hearing on attorney fees was held on the same date. Counsel for Mary testified that they had billed her $1,850 for attorney fees, representing "in excess of 51 hours of work *** at about $40 or $45 an hour," and $101 in court costs. The court took the matter under advisement at the close of all testimony and arguments of counsel, and entered judgment in favor of Mary on June 5, 1981. The court's order awarded plaintiff $1,918, representing $1,850 for attorney fees and $68 for court costs.

On July 2, 1981, the board filed its notice of appeal. Plaintiff filed a cross-appeal on July 10. On January 27, 1982, plaintiff filed in this

court a motion to dismiss the board's appeal, asserting therefor two bases: lack of appellate jurisdiction over the issue of permanent injunctive relief which was granted on January 16, 1981, and mootness. We took both the motion to dismiss and the board's response thereto with the case.

Plaintiff contends that the board's July 2, 1981, notice of appeal, which made specific reference only to the June 5 order, sought appeal only from the order of attorney fees. Therefore, she argues, this court lacks jurisdiction over the issue of the permanent injunction. The board, on the other hand, takes the position that the July 2 notice of appeal was sufficiently broad to encompass the January order of permanent injunctive relief. In support of this position, the board points to language in the notice which, they contend, sufficiently apprised the plaintiff that the board intended to appeal the rulings entered in January. In essence, the notice of appeal reads as follows: "You are *** notified that the Defendant *** appeals *** from the order of the Circuit Court *** entered *** on the 5th *** of June, 1981. By said order the *** Judge *** found all issues in favor of Plaintiff *** and affirmed the prior oral order *** granting plaintiff's *** petition for Permanent Injunctive and Other Relief."

■■ ■ We agree with the board that this language is in substantial compliance with the notice requirement of Supreme Court Rule 303(c) (73 Ill. 2d R. 303(c)) even though it may be technically faulty. Generally, the notice of appeal is to be liberally construed with a view to its purpose. (*Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 394 N.E.2d 380.) Errors made in specifying the dates of orders appealed from have been held not to bar an appeal where the substance of the notice of appeal, as a whole, fairly and clearly informs the other party of the judgments over which review is sought. (*In re Estate of Malloy* (1981), 96 Ill. App. 3d 1020, 422 N.E.2d 76; *Hamer v. Board of Education* (1978), 66 Ill. App. 3d 7, 383 N.E.2d 231.) In our opinion, the notice of appeal herein satisfies the minimum requirements of the rule as liberally construed in that it clearly mentions the grant of injunctive relief as a basis for the appeal. Whether the reference to June 5 was in error because it should have been January 5 (the date of the court's oral order on the issue of permanent injunctive relief) or whether the June 5 date was intended to refer only to the court's award of attorney fees, and the failure to specify January 5 was an error of omission, is not dispositive of the question of adequacy of the notice of appeal. Rather, the purpose of the document—to give fair notice of the issues to be advanced by the appellant—must be met. In this case it was, and the plaintiff has failed in

any event to demonstrate any prejudice resulting from the board's failure to specify the date of the court's grant of injunctive relief. Accordingly, we will not dismiss this appeal for lack of appellate jurisdiction.

■ The plaintiff's second contention for dismissal is based on the doctrine of mootness. The mootness argument requires the recitation of a few additional facts which appear in an affidavit attached to plaintiff's motion to dismiss. The plaintiff was graduated from high school in June 1981. She was accepted for and did commence attending college in the fall 1981 semester at Western Illinois University, Macomb, Illinois. Since plaintiff has already taken the high school examinations, received her grades, and has been accepted into a college of her choice, the argument continues, any decision of this court contrary to that reached in the circuit court could have no practical effect upon either party. We agree with plaintiff's argument.

It is significant to this issue that the trial court specifically found the rule itself was not invalid. We agree. It is a harsh rule, but the broad discretion accorded school authorities enables the rule to be tailored to the specific circumstances of the particular student being disciplined under it. We therefore agree with the trial court that the only basis for a grant of relief to this plaintiff was her complaint that the rule as applied to her deprived her of her rights.

There exists, however, no present controversy between the parties concerning the issue of permanent injunctive relief. Certainly we could not order plaintiff to "untake" the exams. An order of this court reversing the court's order that credit be given for the exams would have, at best, only highly speculative consequences, since plaintiff is already in college. In effect, the issue of this plaintiff's rights to substantive due process is moot.

We also find that the present case does not qualify as an exception to the mootness doctrine. (See *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 104 N.E.2d 769; *Environmental Protection Agency v. Pollution Control Board* (1980), 88 Ill. App. 3d 71, 410 N.E.2d 98; *August H. Skoglund Co. v. Department of Transportation* (1978), 67 Ill. App. 3d 276, 384 N.E.2d 849; *Sosna v. Iowa* (1975), 419 U.S. 393, 42 L. Ed. 2d 532, 95 S. Ct. 553.) Since the matter is moot any further comment on the merits of the trial court's order would be improper because such comment would have advisory effect only. (See *Madison Park Bank v. Zagel* (1982), 91 Ill. 2d 231.) Accordingly, we dismiss the substantive issue of this appeal as moot.

The board has attempted to resist plaintiff's mootness argument by characterizing the other issue raised on appeal—whether attorney

fees were improperly granted by the trial court—as a "collateral legal consequence" requiring our consideration of the entire appeal. (See *Chebny v. Stuart* (1979), 68 Ill. App. 3d 419, 386 N.E.2d 352.) The plaintiff has responded to this argument by citing *Doe v. Marshall* (5th Cir. 1980), 622 F.2d 118, as authority for a reviewing court's consideration of the correctness of awarding attorney fees despite a finding of mootness on the merits.

While we agree generally with the rationale of *Marshall* that the issue of attorney fees is not a collateral legal consequence that would save the substantive issue on appeal from dismissal under the doctrine of mootness, we are not bound to the ultimate disposition obtained in *Marshall*, which was to remand the matter to the trial court for a proper determination of attorney fees. *Marshall* involved, as here, a student who had been granted injunctive relief and had completed high school during the pendency of the appeal. The Fifth Circuit Court of Appeals disposed of the substantive due process issue by finding the matter moot and vacating the order of injunction. The court did not, however, remand for dismissal of the complaint. Therefore, legally and factually, the plaintiff in *Marshall* was a "prevailing party" for purposes of 42 U.S.C. sec. 1988 (1976) despite the application of the mootness doctrine to the due process issue.

In Illinois, however, it is well settled that a finding of mootness requires, in addition to vacatur of the order appealed from, remandment to the circuit court for dismissal of the complaint. *Wheeler v. Aetna Casualty & Surety Co.* (1974), 57 Ill. 2d 184, 311 N.E.2d 134.

Once the complaint is dismissed, there can be no "prevailing party" because the parties, in the eyes of the law, are restored to the positions they had occupied prior to commencement of the suit. Application of the Illinois rule to the instant case means that the plaintiff was not at law a "prevailing party," even though in fact it must be conceded that she was. Undeniably, the plaintiff was successful in that she obtained the injunctive relief she sought in the circuit court. The tests have been given, grades credited and their purpose served in that the test scores could be considered for college admission.

Since we find that the plaintiff was a "prevailing party" in fact, we are faced ultimately with the question of whether the plaintiff in this case has demonstrated a violation of her civil rights sufficient to state a claim under 42 U.S.C. sec. 1983 (1976) for which attorney fees could be awarded under 42 U.S.C. sec. 1988 (1976). We find that she has not. (See *Wood v. Strickland* (1975), 420 U.S. 308, 326, 43 L. Ed. 2d 214, 227, 95 S. Ct. 992, 1003.) In *Wood*, the Supreme

Court stated that section 1983 was not intended to be a vehicle for judicial correction of errors committed by school administrators in the exercise of their discretion respecting matters of student discipline so long as such errors do not rise to the level of violations of specific constitutional guarantees. In this case, it is clear to us that the only violation complained of by the plaintiff was a violation of general rights to substantive due process. As such, the error she complains of does not rise to the level of a violation of specific constitutional guarantees. See *Tinker v. Des Moines Independent Community School District* (1969), 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (violation of first amendment guarantee of free speech and expression); *Epperson v. Arkansas* (1968), 393 U.S. 97, 21 L. Ed. 2d 228, 89 S. Ct. 226 (violation of first amendment establishment clause requiring separation of religion and the State).

Accordingly, we vacate the order of permanent injunction and reverse and vacate the order of June 5 awarding attorney fees. This cause is remanded to the circuit court with directions to dismiss the complaint.

Reversed and remanded.

STOUDER, J., concurs.

JUSTICE ALLOY, dissenting:

I respectfully dissent from the majority opinion in this case.

A case is moot where there is no actual controversy between the parties, and any decision by the court would thereby have no actual effect upon the interests or rights of the parties. The majority reasons that since Miss Myre has graduated from high school and entered college the constitutional question decided below is, "in effect," moot. It must be noted, however, that there has never been any controversy between the parties concerning whether she could graduate or attend college. Such factual assertions are completely extraneous to the controversy which has existed between the parties. The controversy has been and continues to be the right of the school district to enforce its disciplinary regulations against Miss Myre by preventing her taking the exams and preventing her from receiving credit for those exams *on her permanent record.* The trial court's injunction prevented the school from stopping Miss Myre in taking the exams and it mandated that the scores from the exams be entered on her permanent record. The real controversy all along has been centered upon this student's permanent record and the school's authority to

impose sanctions which effect that record. The trial court's mandatory injunction continues in effect and continues to prevent the school district from making any alterations in Miss Myre's record based upon the disciplinary action.

The majority's conclusory finding of mootness, focusing only upon the taking of the exams, fails to consider the real controversy, that being the effect of the disciplinary action on the permanent records of the student. If, as the majority concludes, the matter is moot, to be reversed and remanded thereby leaving the parties in the positions occupied prior to the suit, then the school district would no longer be under a mandatory injunction. While, practically speaking, they can no longer make Miss Myre "untake" the exams, absent the injunction there is nothing to prevent them from correcting Miss Myre's permanent records so as to indicate that no credit is to be given for the exams taken during her disciplinary suspension. This speculation is not meant to encourage such action by the board, in the event the majority opinion is upheld, but rather merely to point out that the actual controversy has been, and continues to be, this student's permanent record and the school board's authority to impose disciplinary measures which have an effect upon that record. This controversy continues despite graduation and entry into college. The majority opinion dismisses as "highly speculative" any consequence of a reversal on our part. Such a view ignores the fact that a student's permanent high school record may have a continuing effect, use and pertinence in our society. Such records are utilized not only by colleges and universities, at undergraduate and post-graduate levels, but also by the government, the military, and private sector employers in reviewing an applicant. There is a continuing actual controversy with important implications for both parties stemming from a decision on the merits in this case. Furthermore, the court has the power to grant effectual relief to the school board, for if the trial court's action is reversed on the merits, as I believe it should be, then the school will be permitted to make the corrections in the permanent record it has sought to make from the start. The other practical effect is that the school board will know the boundaries of its authority in seeking to control and combat drug and alcohol abuse in the schools.

The majority opinion attempts to meet a difficult question by asserting that the controversy no longer exists. At the same time, the opinion seeks to accommodate a fair and correct result by depriving the plaintiff of any recovery of fees for the section 1983 action. The treatment of the section 1983 fees and costs question is seriously flawed. Clearly, as the majority does and must accept, plaintiff Myre

was a prevailing party in the trial court. She obtained the preliminary injunction and was permitted to take the exams and have her scores entered on her permanent record. She is the prevailing party, substantially, even if mootness is used to avoid the central issue in the case. As a result, she would be entitled to fees under 42 U.S.C. sec. 1988 (1976). Section 1988 permits an award for fees and costs to a prevailing party in a 1983 action. To sustain a section 1983 claim a plaintiff must show that a defendant, acting under color of State law, deprived him of any right secured by the Constitution or laws of the United States. (42 U.S.C. sec. 1983 (1976).) In the instant case, the trial court determined that the school district, acting under State law and regulation, deprived Miss Myre of her constitutional right to due process, specifically to substantive due process. The right to due process arises by virtue of the fifth and fourteenth amendments to the United States Constitution. Section 1983 speaks to the "deprivation of any rights, privileges or immunities secured by the Constitution and laws." The majority suggest that section 1983 was not intended to cover this particular constitutional violation. The majority, citing *Wood v. Strickland* in which the United States Supreme Court indicated that courts should be very circumspect in matters of school disciplinary discretion, makes a novel distinction between constitutional rights under section 1983. The majority finds there are specific constitutional rights and there are general constitutional rights, and that section 1983 was meant to cover the former, but not the latter. Presumably, judging from the majority opinion, the first amendment provides for specific rights, while the due process clauses of the fifth and fourteeneth do not. Rather, due process provides only general rights, which are somehow less deserving of and entitled to protection than the more specific constitutional rights. This general and specific distinction utilized by the majority is without basis. The language of section 1983 is "any right secured by the Constitution," and the court in *Wood v. Strickland,* when speaking of "specific constitutional rights," is indicating those rights specifically protected by the Constitution. Due process rights, both procedural and substantive, are specifically protected by the Constitution. The court in *Wood* was saying that substantive due process should very rarely be used by courts to interfere with legitimate discretionary authority given schools in disciplinary matters. The court therein makes no statement or suggestion that substantive due process rights are "general rights" under the Constitution and thereby not entitled to relief under section 1983.

Nevertheless, the majority adopts such a distinction for the purpose of reaching a conclusion that plaintiff Myre is not entitled to

fees. This result, coupled with the mootness finding on the principal issue, is a compromise. Such a compromise is not available here. Either Miss Myre prevails and is entitled to her fees, for the trial court found a violation of the Constitution which is actionable under section 1983, or Miss Myre does not prevail in her claim and is not entitled to fees. The distinction adopted by the majority to have its middle way is without adequate basis. The dissent's position is that the trial court's decision, finding a violation of substantive due process, was wrong and that it was an impermissible infringement by the courts upon the discretionary authority of the school district in disciplinary matters.

The merits of the case should be met. To the merits this dissent now turns.

The record discloses the following undisputed facts. On the night of October 31, 1980, plaintiff Mary Myre and a female friend attended an out-of-town football game between Yorkville and Seneca high schools. Mary Myre, at the time, was a 17-year-old senior at Seneca Township High Shool. On the night of the football game in Yorkville, Mary Myre was found in possession of beer in the Yorkville high school parking lot. She was arrested by Yorkville police, on a possession of alcohol charge. The police, also, that night notified Seneca High School principal David Schmink, who was attending the football game. Mr. Schmink went to the parking lot where he was met by plaintiff Myre and several officers. Miss Myre admitted her mistake, and similar previous mistakes, and wondered what would be done about it by Mr. Schmink. He informed her the matter would be decided at another time, after further discussion with her. The following Monday morning, Principal Schmink met with her and the other student who had been caught in possession of beer at the football game. After the meeting, he imposed a five-day suspension from school on Miss Myre and a two-month prohibition against attending extracurricular activities.

The rules and regulations adopted by the School Board, pursuant to section 24—24 of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 24—24), in pertinent part, stated:

> "The following are considered serious violations of positive constructive student behavior:
>
> ***
>
> 11. Possession, use or distribution of alcohol or drugs.

ALCOHOL/DRUGS

***

4. Following the determination of the use of controlled substances or cannabis and/or alcohol, the following actions will be taken:

First Offense

The student will be suspended from school for five (5) days ***."

The rules and regulations also provided for various methods of discipline to be utilized for major offenses, included was the "in-school suspension." That suspension was stated as follows:

"Students on an in-school suspension will be assigned to a certain room for all class periods. During an in-school suspension, all work is to be done and completed; any tests that are missed cannot be made up, although daily work may be made up. The student forfeits all rights to attend after school activities. Parents will be notified of all in-school suspensions."

Following imposition of the in-school suspension, Miss Myre's parents were notified by telephone and by written notice. An appeal of the suspension was taken by Miss Myre's father, and meetings were held between him and the principal and superintendent. The school board also held a special meeting to meet with Miss Myre's father to consider the suspension. It was reviewed and approved.

On November 6, 1980, Mary Myre began to serve her in-school suspension. She remained in a designated room during all class periods and did not attend regular classes. She was not allowed to take regularly scheduled tests and exams and would not have been allowed, under the rules, to make them up either. She received a zero for tests and exams which occurred during her suspension. On the third day of her scheduled five-day suspension, Mary Myre, by her father as next friend, filed a petition for injunctive relief, requesting a temporary restraining order and a preliminary injunction to prevent the school board from keeping Mary Myre from taking regularly scheduled tests and exams. The circuit court, acting *ex parte*, issued a TRO directing the school board to permit Mary Myre to take her tests and exams and to allow her to make up any tests and exams she had missed because of the suspension. The school district complied with the court's orders.

Shortly before trial on the merits was to begin, plaintiff amended her petition by adding a count III, asserting a cause of action under 42 U.S.C. sec. 1983 (1976), the civil rights statute. The trial proceeded as scheduled, despite the amendment, based upon count I of the petition, alleging deprivation of plaintiff's constitutional right to

due process, specifically substantive due process. At trial, the superintendent of the high school testified concerning the rules and regulations. He stated that an in-school disciplinary suspension was a common procedure throughout schools in the country, and the purpose behind it was to have students stay in the school environment, to encourage them to use their initiative to pursue classroom studies, even though they were prevented from attending regular classes. He also explained how the board had arrived at the policy regarding alcohol and drugs and the prohibition of those items in school or at school functions. He further stated his personal opinion that the purpose of preventing a student from taking exams and tests was to obtain parental cooperation in addressing the problem causing the suspension. The superintendent testified that the rule regarding possession and use of alcohol or drugs was adopted in March 1979, and the policy of allowing an in-school suspension was instituted in 1980.

Further testimony relative to the suspension, its purposes and effects in the case was received from Principal Schmink. He testified that Miss Myre's failure to take the tests during her suspension would not have prevented her graduation, nor would it have hindered her admission to Western Illinois University, Eastern Illinois University, or Northern Illinois University. Her high scores on entrance exams would have assured her of admission to these schools, according to him. He also stated that the purpose of an in-school suspension is to punish the student and to motivate him or her.

On January 5, 1981, after trial, the court, in an oral opinion, stated its findings in the case. The court held that the rule in question, disciplining for possession or use of alcohol was valid, in that it sets forth the violations and the punishment for a violation. The court found no constitutional infirmity with the rule on its face. However, the court ruled that as applied to the plaintiff Mary Myre in the circumstances of this case, the rule violated her right to substantive due process under the Constitution. This ruling was based upon the court's conclusion that the punishment was unduly harsh for the conduct in which Miss Myre engaged. In reaching this conclusion the court construed the rule, requiring a five-day suspension for possession of alcohol, to have been enacted for the purpose of calling the authorities' attention to drug or alcohol conditions of a more chronic nature. The court felt that the rule was not adopted to cover a situation where a student is found with a beer or two at a school football game. The court concluded that the rule as applied did not fit the problem which the court felt it was designed to address. Noting that the principal effect of the punishment was to prevent the student

from taking exams and tests, the court found that such academic sanction was improper when the conduct giving rise to the discipline was not directly related to academic matters. Based upon its finding a disparity between the conduct engaged in by the plaintiff and the discipline meted out by the board, the court found that Miss Myre's substantive due process rights had been violated. It granted permanent injunctive relief, preventing the school from barring plaintiff from taking the exams scheduled during the suspension and ordering that the grades from those exams be reflected on her permanent school record.

The issue is whether the circuit court erred in its conclusion that the disciplinary action by the school board violated plaintiff Myre's substantive due process rights. As the court noted in *Hamer v. Board of Education* (1978), 66 Ill. App. 3d 7, 11:

> "It has been established that rights incident to a public education are property rights entitled to both substantive and procedural due process protection. (*Knight v. Board of Education* (1976), 38 Ill. App. 3d 603, 607, 348 N.E.2d 299, 302.) It is also apparent that further educational and employment opportunities can be impaired by a poor school record or, by the same token, enhanced by a good record. (See *Goss v. Lopez* (1975), 419 U.S. 565, 42 L. Ed. 2d 725, 95 S. Ct. 729.)" (See also *Donaldson v. Board of Education* (1981), 98 Ill. App. 3d 438, 424 N.E.2d 737.)

The appropriate standard for reviewing alleged substantive due process violations resulting from disciplinary action by a school board is whether the action of the board is arbitrary and capricious, in that there is lacking a rational relationship between the punitive action taken and legitimate disciplinary objectives behind the sanction. (*Hamer v. Board of Education* (1978), 66 Ill. App. 3d 7, 11; *Donaldson v. Board of Education* (1981), 98 Ill. App. 3d 438, 439; *Knight v. Board of Education* (1976), 38 Ill. App. 3d 603, 608.) In *Knight*, the court analyzed the issue by weighing the severity of the sanction with the severity of the conduct sanctioned, to arrive at a decision. (38 Ill. App. 3d 603, 608.) It has been repeatedly emphasized, however, that in matters of student discipline, local authorities are given a broad discretion within which to function, and where the actions taken arguably serve a legitimate educational purpose, courts will not interfere, despite the fact that they may disagree with the action. The basis for the courts' reluctance to interfere in such matters was recently stated by the court in *Donaldson v. Board of Education* (1981), 98 Ill. App. 3d 438, 439:

"School discipline is an area which courts enter with great hesitation and reluctance—and rightly so. School officials are trained and paid to determine what form of punishment best addresses a particular student's transgression. They are in a far better position than is a black-robed judge to decide what to do with a disobedient child at school. They can best determine, for instance, whether a suspension or an after-school detention will be more effective in correcting a student's behavior. Because of their expertise and their closeness to the situation—and because we do not want them to fear court challenges to their every act—school officials are given wide discretion in their disciplinary actions."

The circuit court in the instant case utilized a two-step analysis in reaching its conclusion that the rule against possession or use of alcohol or drugs, as applied to Miss Myre, was arbitrary and capricious and violated her right to substantive due process. It first interpreted the rules against possession and use of alcohol or drugs as a measure designed to bring to the attention of authorities acute drug or alcohol conditions in a student. The court stated that the rules did not seem to be specifically adopted to cover the situation where a student is caught with a beer or two at a football game. The court, on that basis, then concluded that the application of the rule to Miss Myre's conduct was not within the intended scope of the purpose for which it was adopted. Having concluded that the rule was being applied to a situation not intended by the board that adopted it, the court then stated its opinion that the punishment imposed (the five-day suspension without being able to take or make up tests and exams) was unduly harsh, in light of the minor nature of the offense. In so concluding, the court apparently placed some emphasis on the fact that the violation occurred at an extracurricular activity while the punishment inherent in the suspension had an effect on academics. I would reverse.

School boards are granted the power to adopt and enforce reasonable rules and regulations in pursuance of their mandated task of maintaining discipline. (Ill. Rev. Stat. 1979, ch. 122, pars. 10—20.5, 24—24.) The obvious underlying purpose of disciplinary rules respecting the possession and use of drugs òr alcohol by students is to control and minimize the presence and effect of such substances among high school students. Such rules are in complete accord with the State and local criminal laws respecting drug and alcohol possession and use by minors. The extent of the problems in this area, throughout the country and State, and their devastating effect upon students and

parents alike is readily apparent and need not be documented. We can take judicial notice of this unfortunate fact of life in our schools. Certainly, as the trial court noted, the schools, in their rules and regulations, are concerned about students with acute drug or alcohol problems. However, school administrators are justifiably as concerned about preventing such problems from ever developing in the first place. They are concerned about controlling and eliminating the presence of drugs or alcohol, in whatever quantities, in and around the school and school activities. In short, they are vitally interested in deterring such conduct from taking place at any level and at any time among their students. The rule adopted by the Seneca board in this case, which by its terms applies to any possession or use of alcohol or drugs, serves that deterrent purpose. The rule as applied to Miss Myre also serves that deterrent purpose and furthers the legitimate purpose and goal of controlling and minimizing the presence and use of drugs and alcohol by students. A school board cannot examine a situation in isolation, divorced of its implications for other students and the overall conduct of the school in general. Youthful drug and alcohol use are problems which cut across all socio-economic groupings. As such, a sanction which has an effect upon grades, and thereby academic standing, may be a very useful deterring measure, especially to those students who themselves, or whose parents, place a high premium upon academic success in school. Without the bite of a potential grade reduction accompanying a suspension, such a sanction would be a toothless measure indeed. The deterrent function of such disciplinary rules would be significantly undermined, if not eliminated entirely, as to any number of students if there were no effect upon grading at all. The use of an in-school suspension, complete with loss of test and examination privileges, serves a significant and legitimate purpose in the school's efforts to control discipline generally, and to control the use of dangerous intoxicants, specifically. The school board's actions in the instant case served those purposes and goals. We find the court's narrow approach to interpretation of the purpose of the school's rule to be unsupported in fact or logic. On its face and by its terms, the rule was adopted and designed to deal with situations wherein a student, in an academic setting or at a school function or activity, was found to be in possession of alcohol or drugs, even a single beer or a single marijuana cigarette. To uphold the circuit court's construction would be contrary to the plain language of the rule and it would be to strip the schools of the power to effectively deal with drug and alcohol problems until they were out of hand. It would do no service to the schools or, ultimately, to the students and

their education.

Possession of drugs or alcohol, however longstanding such custom and however prevalent such may be, is serious, and potentially damaging conduct for a high school student. The in-school five-day suspension herein imposed upon Miss Myre for such conduct on her part was an acceptable and reasonable method for sanctioning her. There exists a rational relationship between the purpose served by the rule and its punitive effect, generally and in this case. Nor is there any impermissible imbalance between the severity of the offense and the severity of the punishment, in light of the purposes and goals behind such punishment. No showing was made that imposition of the sanction would have adversely affected Miss Myre's graduation or her admission to a university. The only evidence on such matters was to the contrary. The School Board's disciplinary action was not arbitrary or capricious. It was rational and reasonable in light of the problems sought to be addressed by the rule.

Some passing comment, in conclusion, needs to be made concerning the distinction drawn by the trial court, and emphasized by appellee on appeal, between academic matters and nonacademic matters. The argument, plainly put, is that academic sanctions are inappropriate for punishing improper conduct which occurs outside the strictly academic context. Such compartmentalizing of the educational function of our schools evidences a strained and myopic approach to the purposes and goals of public education and finds no sanction in the School Code. Schools have an academic aspect, to be sure, and a substantial one, but their primary purpose and goal is education, education in the broad sense of the term. The rules and regulation of a school, especially those dealing with discipline, are designed to further that broad educational objective. Prohibiting school administrators from utilizing academic sanctions, or sanctions with academic implication, against conduct which occurs in a nonacademic setting would strip them of an effective tool for maintaining discipline both at school and at school activities of all natures. As applied in the instant case, it would also strip them of an effective tool for combatting the dangers posed by alcohol and drugs to teenagers. The presence of and the dangers posed by alcohol and drug use are not confined to any one context, and the measures to battle them cannot be confined either, if any success is to be made. An approach such as is argued by appellee would be most difficult to administer, would run contrary to the broad educational purposes of public education, and would be contrary to the best interests of the schools and their students. It is unsound.

I would find, in summary, that the in-school suspension of Mary Myre violated no constitutional right which she possessed and that the court's judgment in her favor should be reversed. With a reversal of the judgment, the award of fees and costs, under section 1983, based upon her having prevailed in the action, would also be reversed.